Electronically Filed
Intermediate Court of Appeals
28108
13-OCT-2010
03:37 PM

NO. 28108

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


IN THE MATTER OF WATER USE PERMIT APPLICATIONS,
PETITIONS FOR INTERIM INSTREAM FLOW STANDARD
AMENDMENTS, AND PETITIONS FOR WATER RESERVATIONS
FOR THE WAIĀHOLE DITCH COMBINED CONTESTED CASE HEARING


APPEAL FROM THE COMMISSION ON WATER RESOURCE MANAGEMENT
(CASE NO. CCH-OA95-1)


MEMORANDUM OPINION
(By: Nakamura, C.J., Circuit Judges McKenna and Chan in place of
Foley, Fujise, Leonard, JJ., all recused)


This is the third appeal arising out of a contested
case hearing before the Commission on Water Resource Management
(Water Commission) regarding waters distributed by the Waiāhole
Ditch System (Waiāhole Ditch). The Waiāhole Ditch is a major
irrigation infrastructure that collects water from the windward
side of Oʻahu and delivers it to the leeward side.

The contested case hearing began in 1995 and involved
twenty-five parties. The Water Commission has issued three
decisions, each containing extensive findings of fact and
conclusions of law. The Hawaiʻi Supreme Court has vacated in
part the prior two decisions issued by the Water Commission and
remanded for further proceedings. The supreme court's opinions
and the Water Commission's actions on remand have served to

significantly reduce the remaining issues in dispute and the number of contesting parties.

In In re Water Use Permit Applications, 94 Hawai'i 97, 9 P.3d 409 (2000) (Waiāhole I), the Hawai'i Supreme Court vacated in part the Water Commission's first decision, which was entitled "Findings of Fact, Conclusions of Law, and Decision and Order" (D&O I), and remanded the case for further proceedings on seven issues. Id. at 189, 9 P.3d at 501. The court affirmed all aspects of D&O I not otherwise addressed in its opinion. Id. at 190, 9 P.3d at 502. On remand, the Water Commission issued its second decision, which was entitled "Legal Framework, Findings of Fact, and Decision and Order" (D&O II). In In re Water Use Permit Applications, 105 Hawai'i 1, 93 P.3d 643 (2004) (Waiāhole II), the Hawai'i Supreme Court vacated in part D&O II and remanded the case for further proceedings on specified issues. Id. at 27, 93 P.3d at 669.

The instant appeal involves the Water Commission's third decision, which was issued on remand after Waiāhole II and is entitled "Findings of Fact, Conclusions of Law, and Decision and Order" (D&O III). Petitioners-Appellants Hakipu'u 'Ohana and Ka Lāhui Hawai'i (collectively, the "Windward Parties"), joined by Appellant Hawai'i's Thousand Friends (HTF),[1] appeal from D&O III. On appeal, the Windward Parties argue that the Water Commission erred in: (1) issuing a water use permit to Appellee The Estate of James Campbell (Campbell Estate) when an alternative ground water source was available; (2) refusing to consider the merits of the Windward Parties' motion to deny the water use permit application of Appellee Pu'u Makakilo, Inc. (PMI), which motion was based on new evidence that PMI did not need the water for which it had applied, and issuing a water use

_____

[1] HTF did not file an opening brief but filed a joinder to the opening brief of the Windward Parties. We will attribute the arguments contained in the Windward Parties' brief to the Windward Parties, with the understanding that HTF has joined in those arguments.

permit to PMI when PMI had not established a reasonable-beneficial use; (3) setting interim instream flow standards (IIFSs)[2] for the windward streams[3] that were not supported by sufficient data and failing to include water that remained unpermitted in the IIFSs.[4]

We hold that: (1) the Water Commission did not err in issuing a water use permit to Campbell Estate; (2) the Water Commission erred by granting PMI a water use permit without considering the merits of the Windward Parties' motion, which was based on new evidence that PMI did not need the water for which it had applied for a reasonable-beneficial use; and (3) the Water Commission did not err in setting the IIFSs for the windward streams and in declining to include unpermitted water in the IIFSs.

BACKGROUND

The facts underlying this case are set forth in detail in <u>Waiāhole I</u> and <u>Waiāhole II</u>. We will limit our discussion to

---

[2] Hawaii Revised Statutes (HRS) § 174C-3 (1993) defines the terms "[i]nstream flow standard" and "[i]nterim instream flow standard" as follows:

"Instream flow standard" means a quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year to protect fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses.

. . . .

"Interim instream flow standard" means a temporary instream flow standard of immediate applicability, adopted by the commission without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard.

[3] The windward streams for which D&O III set IIFSs were the Waiāhole, Waianu, Waikāne, and Kahana Streams.

[4] While this appeal was pending, the following substitution of parties took place: 1) James Campbell Company LLC (JCCLLC) was substituted for the Campbell Estate, Monsanto Company was partially substituted for JCCLLC, and Syngenta Hawaii, LLC was substituted for JCCLLC, which then withdrew as a party-in-interest in the case; and 2) Grace Pacific Corporation was substituted for PMI. For simplicity purposes, we will use "Campbell Estate" and "PMI" to refer not only to Campbell Estate and PMI, but to the parties that have been substituted for and have replaced them in this appeal.

3

the background facts pertinent to the issues raised in this
appeal.

The circumstances leading to the Water Commission's
issuance of D&O I are summarized as follows:

> [T]he Waiāhole Ditch system, built in significant part
> between 1913 and 1916, collects fresh surface water and
> dike-impounded ground water from windward O'ahu and delivers
> it to leeward O'ahu.  For many years, the ditch diversions,
> along with ground water pumped from the Pearl Harbor
> aquifer, irrigated O'ahu Sugar Company's sugar plantation.
> These diversions, however, reduced the water flow in
> Waiāhole, Waikāne, Waianu, and Kahana streams, thereby
> affecting the streams' natural environment and nearby human
> communities.
>
> . . . .
>
> Following the designation of windward O'ahu's five
> aquifer systems as ground water management areas in 1992,
> the existing users of Waiāhole Ditch water were required to
> apply for water use permits.  In June 1993, the former
> operator of the ditch system, the Waiāhole Irrigation
> Company,[2/] filed a combined permit application for the
> existing users of the Waiāhole Ditch water.  In August 1993,
> large amounts of ditch water became available when O'ahu
> Sugar Company announced the end of its sugar operations.
> Various parties filed applications for existing water use
> permits, applications for new water use permits, petitions
> to restore water to streams by amending the IIFS, and
> petitions for reservations of water.  In 1995, the Water
> Commission admitted a total of twenty-five parties,
> including the Windward Parties and HTF, and commenced a
> combined contested case hearing for all applications and
> petitions.
>
> _____
>
> [2/] In July 1999, ADC acquired the operations of the
> Waiāhole Ditch system from the Waiāhole Irrigation Company.

Waiāhole II, 105 Hawai'i at 5-6, 93 P.3d at 647-48 (citations
omitted).

I.  D&O I

On December 24, 1997, the Water Commission issued
D&O I.  In D&O I, out of the 27 million gallons per day (mgd) of
water flowing through the Waiāhole Ditch, the Water Commission
(1) assigned 14.03 mgd to permitted leeward agricultural and
nonagricultural uses and system losses and (2) released 12.97 mgd
into windward streams.  Id. at 6, 93 P.3d at 648.  The water use
permits issued by the Water Commission included a permit to PMI
for golf course use and a permit to Campbell Estate to irrigate

agricultural properties.  Waiāhole I, 94 Hawai'i at 164-65, 9 P.3d at 476-77.  Of the 12.97 mgd released into windward streams, 6.0 mgd were allocated to amending the IIFSs for windward streams by adding 4.0 mgd to the base flow of Waiāhole Stream and 2.0 mgd to the base flow of Waianu Stream, and 6.97 mgd were kept available for leeward offstream uses as a "proposed agricultural reserve" or "non-permitted ground water buffer."  Id. at 116-18, 9 P.3d at 428-30.

## II.  Waiāhole I

In Waiāhole I, the Hawai'i Supreme Court vacated the water use permit issued to Campbell Estate because "[i]n neglecting to address the practicability of using pumped ground water as an alternative to stream diversion, the [Water] Commission failed to establish an adequate basis for the allocations granted to Campbell Estate."  Id. at 165, 9 P.3d at 477.  The court also vacated PMI's water use permit because the Water Commission had granted PMI's requested allocation "without any reasoned discussion of the practicability of using ground water . . . ."  Id. at 171, 9 P.3d at 483.  The court remanded the case to the Water Commission for additional findings and conclusions regarding, among other things, "the practicability of Campbell Estate and PMI using alternative ground water sources[.]"  Id. at 189, 9 P.3d at 501.

The court also vacated the IIFSs for windward streams set forth in D&O I and remanded the case for "the designation of an [IIFS] for windward streams based on the best information available, as well as the specific apportionment of any flows allocated or otherwise released to the windward streams[.]"  Id. at 156, 189, 9 P.3d at 468, 501.

## III.  D&O II

On remand, the Water Commission issued D&O II on December 28, 2001.  The Water Commission found that Campbell Estate had no practicable alternatives to Waiāhole Ditch water and issued Campbell Estate a water use permit for 4.74 mgd.  Waiāhole II, 105 Hawai'i at 16, 93 P.3d at 658.  With respect to

PMI, the Water Commission found that PMI had no practicable alternatives to Waiāhole Ditch water and issued PMI a water use permit for 0.75 mgd. Id. at 17, 93 P.3d at 659.

The Water Commission used the "half approach" to amend the IIFSs. Waiāhole II, 105 Hawai'i at 9-10, 93 P.3d at 651-52. The Water Commission explained that,

> a reasonable and practicable approach would be to restore [the windward streams] to one-half their pre-[Waiāhole] Ditch base flow levels which would also exceed their 1960 levels where testimony established the presence of aquatic biota at a higher level than today. The [Water] Commission believes that the IIFSs set at such a level would protect aquatic biota in the streams.

Id. at 10, 93 P.3d at 652 (emphasis in original omitted). The Water Commission first determined two sets of possible pre-Waiāhole Ditch flow measurements for the windward streams, one based on 1911 stream data and the other based on each stream's current base flow plus the flow diverted by the Waiāhole Ditch. Id. at 9, 93 P.3d at 651. It then calculated the amount of Waiāhole Ditch water that would need to be added to each windward stream to reach one-half of the two possible pre-Waiāhole Ditch flow measurements, taking the higher of the two calculations in setting the IIFSs for the streams. Id. at 9-10, 93 P.3d at 651-52. Finally, the Water Commission added an additional 1.1 mgd to the Waiāhole and Waianu Streams and .10 mgd to the Waikāne Stream, after considering appurtenant rights, riparian uses, and existing uses. Id. at 10, 93 P.3d at 652.

Based on this approach, the Water Commission set the IIFSs for the windward streams as follows, with the figures in parentheses showing the amount of Waiāhole Ditch water added to each stream: 1) Waiāhole Stream, 8.7 mgd (4.8 mgd added); 2) Waianu Stream, 3.5 mgd (3.0 mgd added); 3) Waikāne Stream, 3.5 mgd (2.1 mgd added); and 4) Kahana Stream, 11.2 mgd (0 mgd added). Id. at 10, 93 P.3d at 652. The Water Commission did not make any findings regarding the 2.2 mgd of unpermitted Waiāhole Ditch water that was not allocated to the IIFSs. Id. at 13, 93 P.3d at 655.

IV. Waiāhole II

In Waiāhole II, the Hawai'i Supreme Court vacated the water use permit issued to Campbell Estate on the ground that Campbell Estate had failed to meet its burden of establishing that no practicable alternative sources of water existed. Id. at 16-17, 93 P.3d at 658-59. The court noted that the Water Commission had entered no findings of fact or conclusions of law as to whether Campbell Estate had met its burden. Id. The court stated that, on remand,

> [i]f the Water Commission enters findings that Campbell Estate satisfied its burden [of establishing that no practicable alternatives existed], the Water Commission must clearly articulate the alternatives presented by Campbell Estate and its analysis of those alternatives in determining whether each alternative is practicable, together with proper citations to the record.

Id. at 17, 93 P.3d at 659.

The court concluded that PMI had met its burden of establishing the absence of practicable alternative water sources. Id. at 17-19, 93 P.3d at 659-61. Nevertheless, the court vacated PMI's permit because the Water Commission had "erred by basing its decision that Campbell Estate and PMI had no practical alternative water sources (1) on the effect reduced water flows will have on the economic viability of the [Waiāhole] Ditch and (2) on the theory that public trust resources may not be prioritized." Id. at 20, 93 P.3d at 662. Because the court could not tell if the Water Commission had relied upon these two factors in reaching its decision that Campbell Estate and PMI had no practicable alternative water sources, the court stated that it had "no choice" but to vacate their water use permits and remand for further proceedings." Id. at 20-21, 93 P.3d at 662-63.

The court concluded that the Water Commission had erred in relying upon the "half approach" in establishing the IIFSs for windward streams. Id. at 10-11, 93 P.3d at 652-53. The court further concluded that the Water Commission did not clearly err in "deem[ing] credible the testimony that the flow in the 1960s

was adequate to support the stream's ecosystem and native Hawaiian customs and practices." Id. at 12, 93 P.3d at 654. The court, however, held that the Water Commission failed to make findings of each windward stream's flow during the 1960s and thus failed to support the Water Commission's "conclusion that the current IIFS flow is more than the flow in the 1960s." Id. The court remanded this issue for further proceedings and stated:

> If, on remand, the Water Commission is able to support its conclusion with findings quantifying the windward streams' flows during the 1960s, then the 1960s testimonials would be sufficient to set the IIFS at the levels established in the D&O II, inasmuch as: (1) more water would be added to the streams than that which adequately supported the streams' ecosystem in the 1960s; (2) the increase in stream flow over the 1960s stream flow would be beneficial in light of the Water Commission's finding that increasing a stream's flow results in stream habitat improvement; and (3) appurtenant rights, riparian uses, and existing uses would be accounted for by further increases in stream flow. The foregoing would then adequately establish that instream values would be protected to the extent practicable for interim purposes.

Id. (citations and footnote omitted).

## V.    D&O III

On remand from Waiāhole II, the Water Commission issued D&O III on July 13, 2006. The Water Commission considered evidence proffered by the Campbell Estate regarding five alternative ground-water sources from the Waipahu-Waiawa Aquifer for the Waiāhole Ditch water. The Commission concluded that the construction of a new well that would draw ground water from the Waipahu-Waiawa Aquifer provided an alternative ground-water source to Waiāhole Ditch water to irrigate Campbell Estate's lands. The Water Commission further concluded, however, that the water from the Waipahu-Waiawa Aquifer was not a practicable alternative to the Waiāhole Ditch water for Campbell Estate's water use permit application. The Water Commission noted that Waipahu-Waiawa Aquifer water is potable and its highest and best use is for domestic use by the general public, particularly as drinking water, whereas the highest and best use of non-potable Waiāhole Ditch water is for agricultural irrigation. Based on its prioritization of these two available public trust resources,

the Water Commission concluded that Waipahu-Waiawa Aquifer water, and any well using such water, is not a practicable alternative to the use of Waiāhole Ditch water to irrigate Campbell Estate's agricultural lands. Accordingly, after considering the needs of the fields on Campbell Estate's lands in actual cultivation, the Water Commission issued a water use permit to Campbell Estate for 3.98 mgd.

With respect to PMI's water use permit application, the Windward Parties[5] filed a motion with the Water Commission to deny PMI's application. The motion proffered new evidence of changed circumstances showing that PMI did not need the requested 0.75 mgd. In support of its motion, the Windward Parties cited evidence that although PMI's original permit request in 1995 was to use the 0.75 mgd to irrigate a planned golf course, the golf course was not in operation and that PMI had used only a negligible amount of the 0.75 mgd that had been allocated to PMI. The Windward Parties also referred to a newspaper article which suggested that PMI had abandoned its plans to use its property for a golf course.

The Water Commission refused to consider the merits of the Windward Parties' motion in the proceedings on remand from Waiāhole II and denied the motion as being outside the scope of the supreme court's remand. The Water Commission ruled that the "remanded hearing was convened specifically to clarify the basis on which the [Water] Commission concluded that there were no practicable alternatives for PMI's use of [Waiāhole D]itch water and not to revisit the [Water] Commission's original award in D&O I of 0.75 mgd to PMI as a reasonable and beneficial use." The Water Commission therefore denied the Windward Parties' motion without prejudice and stated that the motion would be "addressed and decided by the [Water] Commission, but not in this limited remand from the Court." The Water Commission reiterated

_____

[5] The motion was filed by Hakipu'u 'Ohana and Ka Lāhui Hawai'i as well as the Kahalu'u Neighborhood Board.

findings of fact from D&O II that led to its conclusion that PMI had no practicable alternatives water sources for PMI's permit application and confirmed that this was the basis for the Water Commission's granting the water use permit to PMI. The Water Commission therefore reinstated PMI's water use permit for 0.75 mgd.

In addressing the IIFS issue, the Water Commission used information from the United States Geological Survey (USGS) to support its finding that the base flows of windward streams in the 1960s were as follows: "1) Waiāhole Stream: 3.9 mgd at its confluence with Waianu Stream; 2) Waianu Stream: 0.5 mgd at its confluence with Waiāhole Stream; 3) Waikāne Stream: 1.4 mgd at altitude of 75 feet; and 4) Kahana Stream: 11.2 mgd at altitude of 15 feet." The Water Commission concluded that these base flows have remained stable since the 1960s and were the base flows for the windward streams when the IFFSs were first established in 1992. The Water Commission found that stability in the Waiāhole Ditch flows started in about 1938. It analyzed three Waiāhole Ditch-related events that took place since the mid-1960s that might have affected the windward streams' base flows and concluded that none of the events had a significant impact on the 1960s base flows.

The Water Commission set the amended IIFSs at higher levels than the 1960s base flows. The amended IIFSs set forth in D&O III are as follows, with the figures in parentheses showing the amount of Waiāhole Ditch water added to the streams: Waiāhole Stream, 8.7 mgd (4.8 mgd added); Waianu Stream, 3.5 mgd (3.0 mgd added); Waikāne Stream 3.5 mgd (2.1 mgd added); and Kahana Stream 13.3 mgd (2.1 mgd added).[6] Thus, under the amended IIFSs, the Water Commission added 12 mgd of Waiāhole Ditch water to the windward streams.

---

[6] In comparison with D&O II, D&O III confirmed the IIFS for Waikāne Stream; kept the same IIFSs for Waiāhole and Waianu Streams, but removed the variable IIFSs; and increased the IIFS for Kahana Stream by 2.1 mgd.

Of the remaining 15 mgd of Waiāhole Ditch water available for offstream uses, the Water Commission issued permits for 12.57 mgd, leaving 2.43 mgd of Waiāhole Ditch water that remained unpermitted. The Water Commission did not add the 2.43 mgd of unpermitted water to the IIFSs, but determined that it would be diverted into the windward streams until such time as it is permitted for offstream use. The Water Commission ruled that "[t]he unpermitted water and any permitted water not needed for day-to-day operations will be diverted into the windward streams as previously specified in D&O I and D&O II; i.e., 0.9 mgd into Waikāne Stream and the remainder into Waiāhole Stream . . . ."

## STANDARDS OF REVIEW

In <u>Waiāhole II</u>, the Hawai'i Supreme Court set forth the following standards of review for a decision of Water Commission and the interpretation of the State Water Code, HRS Chapter 174C:

A. Judicial Review of the Water Commission's Decision

"Trial de novo is not allowed on review of commission actions under" Hawai'i Revised Statutes (HRS) chapter 174C. HRS § 174C-12 (1993). This court's review of the Water Commission's D&O II is governed by HRS chapter 91, which provides in relevant part that:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS §§ 174C-12 and 91-14(g) (1993). "[U]nder HRS § 91-14(g), conclusions of law [(COL)] are reviewable under subsections

(1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact [(FOF)] under subsection (5); and an agency's exercise of discretion under subsection (6)." In re Hawaiian Elec. Co., 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citing Outdoor Circle v. Harold K.L. Castle Trust Estate, 4 Haw. App. 633, 638, 675 P.2d 784, 789 (1983)).

As such, the Water Commission's COLs are freely reviewable under the right/wrong standard "to determine if [its] decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law." Waiāhole I, 94 Hawai'i at 119, 9 P.3d at 431 (citations omitted). The Water Commission's FOFs are reviewed under the clearly erroneous standard "to determine if the [Water Commission's] decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." Id. (citations omitted). A FOF is clearly erroneous when "(1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." Id. (citation omitted). Substantial evidence is defined as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation and quotation marks omitted).

We review the Water Commission's action "pursuant to the deferential abuse of discretion standard." Paul's Electrical Service, Inc. v. Befitel, 104 Hawai'i 419, 91 P.3d at 501-02 (2004) (holding that "[i]f the legislature has granted the agency discretion over a particular matter, then we review the agency's action pursuant to the deferential abuse of discretion standard [ ]bearing in mind that the legislature determines the boundaries of that discretion"). However, because water is a public trust resource and the public trust is a state constitutional doctrine, this court recognizes certain qualifications to the standard of review regarding the Water Commission's decisions. Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455. "As with other state constitutional guarantees, the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state." Id. (citation omitted).

> This is not to say that this court will supplant its judgment for that of the legislature or agency. However, it does mean that this court will take a "close look" at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency or legislative action.

Id. at 144, 9 P.3d at 456 (citations omitted) (emphasis in original). As such, "the [Water Commission] may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." Id. at 143, 9 P.3d at 455.

12

B. Interpretation of the State Water Code

In construing statutes, this court has recognized that

our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists . . . .

In construing an ambiguous statute, the meaning of the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning.

Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

Id. at 144, 9 P.3d at 456 (citations, quotation marks, brackets, and formatting omitted) (ellipses in the original).

If the legislature has unambiguously spoken, the inquiry ends.

When the legislative intent is less than clear, however, this court will observe the well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

Id. (citations and quotation marks omitted). "The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose. Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation." Id. at 145, 9 P.3d at 457 (citations omitted).

Waiāhole II, 105 Hawai'i at 7-9, 93 P.3d at 649-51 (brackets, emphasis, and ellipsis points in original).

DISCUSSION

I.   Campbell Estate's Water Use Permit

The Windward Parties argue that the Water Commission erred in issuing a water use permit to Campbell Estate because (1) it was arbitrary and capricious to allocate Waiāhole Ditch water to Campbell Estate when Waipahu-Waiawa Aquifer water was available; and (2) the Water Commission should have engaged in rulemaking procedures when it "reserved" Waipahu-Waiawa Aquifer for domestic, drinking purposes.  We disagree with the Windward Parties' arguments.

A.   The Water Commission's decision to give priority to potable Waipahu-Waiawa Aquifer water over non-potable Waiāhole Ditch water in granting Campbell Estate's permit application was not arbitrary or capricious.

1.

The Water Commission granted Campbell Estate a water use permit of 3.98 mgd of Waiāhole Ditch water to irrigate Campbell Estate's agricultural lands.  In rendering its decision, the Water Commission found that there were two potential sources for the water requested by Campbell Estate, both of which were public trust resources: (1) potable groundwater from the Waipahu-Waiawa Aquifer;[7] and (2) non-potable Waiāhole Ditch water.  The Water Commission stated that "the highest and best use of potable Waipahu-Waiawa Aquifer water is domestic use of the general public, particularly drinking water."[8]

---

[7] The Water Commission noted that Campbell Estate's obtaining water from the Waipahu-Waiawa Aquifer through the drilling of a new well "is a reasonable alternative to Waiāhole Ditch waters on the basis of cost, existing technology, and logistics."

[8] HRS § 174C-3 defines "[d]omestic use" to mean "any use of water for individual personal needs and for household purposes such as drinking, bathing, heating, cooking, noncommercial gardening, and sanitation."

The Water Commission then explained its determination that potable Waipahu-Waiawa Aquifer water was not a practicable alternative source to Waiāhole Ditch water for Campbell Estate's water needs:

> It is the [Water] Commission's priority that water resources be matched with their highest and best use. When applied by the [Water] Commission to water for agriculture uses from a potable versus non-potable water source, the decision must be the use of [Waiāhole] Ditch water and not water from the Waipahu-Waiawa Aquifer to irrigate Campbell Estate's agricultural lands. Non-potable Waiāhole Ditch water is available for its highest and best use, agricultural irrigation. Agricultural use is not the highest and best use of the Waipahu-Waiawa Aquifer. To use potable Waipahu-Waiawa Aquifer water when a non-potable source is equally and even more available, taking into consideration cost, existing technology and logistics in light of the overall water planning process, would be counter to the priorities of the [Water] Commission.
>
> . . . The [Hawai'i Supreme] Court has concluded that "considering whether alternative water resources are practicable innately requires prioritizing among public trust resources." ([Waiāhole II,] 105 [Hawai'i] at 20, [93 P.3d at 662]) The [Water] Commission's prioritizing results in the conclusion that the highest use for [Waiāhole] Ditch water is for agricultural uses, while the highest use for Waipahu-Waiawa Aquifer water is for potable purposes. Campbell Estate's water use permit application was for agriculture use on its lands, which is best met with [Waiāhole] Ditch waters. Thus, after prioritizing among these two public trust resources, the [Water] Commission concludes that Waipahu-Waiawa Aquifer water is not a practicable alternative water resource, and a new well using such water, or any well utilizing the same source, is not a practicable alternative to the use of [Waiāhole] Ditch water to irrigate Campbell Estate's lands.

(Brackets in original omitted.)

We conclude that it was not arbitrary, capricious, or an abuse of discretion for the Water Commission to prioritize between trust resources and to allocate non-potable Waiāhole Ditch water for Campbell Estate's agricultural needs instead of potable Waipahu-Waiawa Aquifer water, which could be used to satisfy the public's future drinking water needs.

2.

HRS § 174C-49(a) (1993)[9] sets forth the conditions that an applicant for a water use permit must satisfy. Among the conditions relevant to this appeal are that "the applicant [must] establish that the proposed use of water: . . . (2) Is a reasonable-beneficial use as defined in section 174C-3; . . . [and] (4) Is consistent with the public interest[.]" HRS § 174C-49(a). HRS § 174C-3 defines the term "[r]easonable-beneficial use" to mean "the use of water in such a quantity as is necessary for economic and efficient utilization, for a purpose, and in a manner which is both reasonable and consistent with the state and county land use plans and the public interest."

In Waiāhole I, the Hawai'i Supreme Court explained:

> The Code's "reasonable-beneficial use" standard allows use only "in such a quantity as is <u>necessary</u> for economic and efficient utilization." HRS § 174C-3 (emphasis added). Furthermore, besides advocating the social and economic utility of their proposed uses, permit applicants must also demonstrate the absence of practicable mitigating measures, including the use of alternative water sources. Such a requirement is intrinsic to the public trust, the statutory instream use protection scheme, and the definition of "reasonable-beneficial" use, and is an essential part of any balancing between competing interests.

---

[9] HRS § 174C-49(a) provides as follows:

**Conditions for a permit.** (a) To obtain a permit pursuant to this part, the applicant shall establish that the proposed use of water:

(1) Can be accommodated with the available water source;

(2) Is a reasonable-beneficial use as defined in section 174C-3;

(3) Will not interfere with any existing legal use of water;

(4) Is consistent with the public interest;

(5) Is consistent with state and county general plans and land use designations;

(6) Is consistent with county land use plans and policies; and

(7) Will not interfere with the rights of the department of Hawaiian home lands as provided in section 221 of the Hawaiian Homes Commission Act.

Waiāhole I, 94 Hawai'i at 161-62, 9 P.3d at 473-74 (footnote and some citations omitted).

The court noted that "states have uniformly recognized domestic uses, particularly drinking, as among the highest uses of water resources[,]" and the court recognized "domestic water use as a purpose of the state water resources trust." Id. at 137, 9 P.3d at 449. The court further stated that "[u]nder the public trust, the state has both the authority and the duty to preserve the rights of present and future generations in the waters of the state." Id. at 141, 9 P.3d at 453; see Haw. Const. Art. XI, § 1 (requiring the protection and conservation of water resources "[f]or the benefit of present and future generations").

In Waiāhole II, the court concluded that "[c]onsidering whether alternative water resources are practicable innately requires prioritizing among public trust resources. As such, by failing to prioritize among public trust resources, the Water Commission failed to fulfill its duty, under the Water Code and the public trust doctrine, of considering whether practicable alternatives exist." Waiāhole II, 105 Hawai'i at 20, 93 P.3d at 662.

3.

We conclude that the Water Commission's decision-making in granting Campbell Estate's permit application was consistent with the analytical framework established by the Hawai'i Supreme Court. There is no dispute that the alternative sources of water that could satisfy Campbell Estate's agricultural irrigation needs were both public trust resources. Thus, in rendering its decision, the Water Commission had to prioritize among public trust resources and balance between competing interests. The Water Commission determined that in addressing Campbell Estate's water needs, it was better to use non-potable Waiāhole Ditch water and to conserve potable Waipahu-Waiawa Aquifer water, which could be used for domestic purposes, such as drinking water. This determination is consistent with the Waiāhole I court's recognition of domestic uses of water, "particularly drinking, as

17

among the highest uses of water resources" and "domestic water use as a purpose of the state water resources trust." Waiāhole I, 94 Hawai'i at 137, 9 P.3d at 449.

In deciding Campbell Estate's permit application, the Water Commission made a policy choice to give priority to a potable water resource over a non-potable water resource. We cannot say that the Water Commission's policy choice was arbitrary or capricious or that the Water Commission abused its discretion. The Windward Parties' contention that there is no immediate need to use Waipahu-Waiawa Aquifer water for drinking water does not change our conclusion. The Water Commission was entitled to consider the future water needs of Hawai'i and its people in fulfilling the State of Hawai'i's "obligation to protect, control and regulate the use of Hawai'i's water resources for the benefit of its people." Haw. Const. Art. XI, § 7; see Haw. Const. Art. XI, § 1.

B.    The Water Commission did not violate rulemaking procedures in explaining its reasons for determining that potable Waiphau-Waiawa Aquifer water was not a practicable alternative to non-potable Waiāhole Ditch water for Campbell Estate's permit application.

Under HRS § 174C-49(d) (1993), "[t]he [Water C]ommission, by rule, may reserve water in such locations and quantities and for such seasons of the year as in its judgment may be necessary." (Emphases added.) As noted, in resolving Campbell Estate's permit application, the Water Commission referred to a policy of matching water resources with their highest and best use. In the context of Campbell Estate's permit application, the Water Commission explained that "the highest and best use of potable Waipahu-Waiawa Aquifer water is domestic use of the general public, particularly drinking water," whereas the highest and best use of non-potable Waiāhole Ditch water is agricultural irrigation. Therefore, the Water Commission concluded that for purposes of irrigating Campbell Estate's agricultural lands, Waipahu-Waiawa Aquifer water was not a

practicable alternative to Waiāhole Ditch water, which it found was equally and even more available than Waipahu-Waiawa Aquifer water.

The Windward Parties contend that the Water Commission's explanation of its policy choice of giving potable water priority over non-potable water in determining Campbell Estate's permit application constituted improper rulemaking. They claim that the Water Commission's statement that the highest and best use of potable Waipahu-Waiawa Aquifer water is for domestic use constituted a "reservation" of water under HRS § 174C-49(d).  We disagree.

In Waiāhole I, the Hawai'i Supreme Court rejected a similar argument.  In that case, PMI argued that the Water Commission's expression of its intention to hold non-agricultural uses of water to higher standards and conditions than other uses constituted "illegal rulemaking."  Waiāhole I, 94 Hawai'i at 168-71, 9 P.3d at 480-83.  The court recognized that

> the line between agency rulemaking and adjudication is not always a clear one and in fact the two functions merge at many points.  In exploring this problematic distinction, therefore, we have adopted the general rule that the choice between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.

Id. at 169, 9 P.3d at 481 (internal quotation marks, brackets, and citations omitted).

The court further explained:

> One useful distinction between rulemaking and adjudication is that the former affects the rights of individuals in the abstract while the latter operates concretely upon individuals in their individual capacity. In this case, the [Water] Commission was required by law to rule on the various competing permit applications, including that of PMI, by way of an adjudicative proceeding.  Based on the evidence presented at the hearing, the [Water] Commission decided, in view of the particular water source in question and the specific competing interests involved, that it would hold certain uses to a higher standard than others.  The [Water] Commission did not, as PMI and others allege, propose any general rules automatically applicable in all circumstances, but instead devised a principled solution to a specific dispute based on facts applied to rules that have already been promulgated by the legislature -- the definition of agency adjudication.

19

> In rendering its decision, the [Water] Commission developed new policies and guidelines that may very well precedentially affect future cases involving the Waiāhole Ditch System and perhaps other water sources. Such a process does not constitute rulemaking. As we stated in [In re] Hawaiian Electric [Co., 81 Haw. 459, 467, 918 P.2d 561, 569-70 (1996)]:

>> In exercising its quasi-judicial function, an agency must frequently decide controversies on the basis of new doctrines, not theretofore applied to a specific problem, though drawn to be sure from broader principles reflecting the purposes of the statutes involved and from the rules invoked in dealing with related problems. If the agency decision reached under the adjudicatory power becomes a precedent, it guides future conduct in much the same way as though it were a new rule promulgated under the rule-making power.

Id. at 169-70, 9 P.3d at 481-82 (internal quotation marks, brackets, citations, and ellipsis points omitted). The court held that "the [Water] Commission's distinctive treatment of 'nonagricultural uses' in its decision did not constitute illegal rulemaking.'" Id. at 171, 9 P.3d at 483.

In the present case, the Water Commission was called upon to resolve a specific dispute presented by Campbell Estate's permit application. In deciding the question of whether Campbell Estate had any practicable alternative water source to Waiāhole Ditch water, the Water Commission balanced competing interests and decided to give priority to potable Waiphau-Waiawa Aquifer water over non-potable Waiāhole Ditch water. The Water Commission explained that its determination that Waiphau-Waiawa Aquifer water was not a practicable alternative for Campbell Estate's permit application was based on the Water Commission's assessment of the highest and best use of the available Waipahu-Waiawa Aquifer water and Waiāhole Ditch water and its matching of these waters with their highest and best uses. The Water Commission's explanation of its rationale was in conformance with the Waiāhole II court's direction that on remand, the Water Commission "must clearly articulate" its analysis of the alternative water sources presented by the Campbell estate in determining whether those alternatives were practicable.

We conclude that the Water Commission did not engage in illegal rulemaking in explaining its rationale for determining that Waipahu-Waiawa Aquifer water was not a practicable alternative for Campbell Estate's permit application. The Water Commission was required to adjudicate a specific dispute presented by Campbell Estate's permit application. In adjudicating this dispute, the Water Commission explained its analysis. In doing so, the Water Commission did not "propose any general rules automatically applicable in all circumstances," see Waiāhole I, 94 Hawai'i at 169, 9 P.3d at 481, but instead made choices necessary to adjudicate the specific dispute before it.

The Water Commission did not state that it was imposing a general rule that water from the Waipahu-Waiawa Aquifer could only be used for domestic use, but simply explained its reason for determining that such water was not a practicable alternative in this case for Campbell Estate's permit application. The Water Commission did not foreclose the possibility that it would permit the use of Waipahu-Waiawa Acquifer water for non-domestic purposes where different circumstances or different competing interests were involved. Our conclusion that the Water Commission did not engage in illegal rulemaking is supported by the general rule that the "choice between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." Id. (internal quotation marks and citation omitted).

For essentially the same reasons, we conclude that the Water Commission did not "reserve" Waipahu-Waiawa Aquifer water for domestic use by stating that "the highest and best use of potable Waipahu-Waiawa Aquifer water is domestic use of the general public, particularly drinking water." The term "reserve" is not defined in the State Water Code or in the relevant administrative rules. See In re Wai'ola O Moloka'i, Inc., 103 Hawai'i 401, 427, 83 P.3d 664, 690 (2004) (Wai'ola). According to Merriam-Webster's Collegiate Dictionary 1059 (11th ed. 2003),

21

"reserve" is defined as verb meaning "to hold in reserve: keep back" and "to set or have set aside or apart." See Schefke v. Reliable Collection Agency, Ltd., 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001) ("We may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined." (internal quotation marks and citation omitted)). Where established, a reservation of water pursuant to HRS § 174C-49(d) has consisted of a specific amount of water set aside for a particular party and for particular uses. See generally, Wai'ola, 103 Hawai'i at 423-33, 83 P.3d at 686-96.

The Water Commission did not "reserve" Waipahu-Waiawa Aquifer water solely for domestic use. As noted, the Water Commission did not state that it was imposing a general rule that water from the Waipahu-Waiawa Aquifer could only be used for domestic use. Nor did it preclude the use of Waipahu-Waiawa Acquifer water for non-domestic purposes under different circumstances or where different competing interests were involved. Accordingly, in deciding Campbell Estate' permit application, the Water Commission did not "reserve" Waipahu-Waiawa Aquifer water by location and quantity or season within the meaning of HRS § 174C-49(d).

II. PMI's Water Use Permit

On remand from Waiāhole II, the Windward Parties filed a motion to deny PMI's permit application for 0.75 mgd of Waiāhole Ditch water, which PMI had justified as necessary to irrigate PMI's planned golf course. In support of its motion, the Windward Parties proffered new evidence of changed circumstances which they contended established that PMI no longer needed the 0.75 mgd because PMI's plans to operate a golf course had been indefinitely delayed or abandoned. The Water Commission denied the motion without considering its merits because the Water Commission viewed the motion as raising issues beyond the scope of the supreme court's remand in Waiāhole II. Thus, in deciding PMI's permit application, the Water Commission limited

22

its consideration to the specific issue remanded by the Waiāhole II court, namely, the practicability of PMI using alternative ground water sources.

On appeal, the Windward Parties argue that the Water Commission erred in granting PMI's water use permit application without considering the Windward Parties' motion on the merits. They describe their motion as providing "new evidence of changed circumstances establish[ing] that PMI did not need anything close to 0.75 mgd to economically and efficiently utilize its property." We conclude that the Water Commission erred in refusing to consider the Windward Parties' motion on the merits before deciding PMI's permit application.

A.    The Windward Parties' motion on remand

In Waiāhole II, the supreme court concluded that PMI had met its burden of establishing the absence of practicable alternative water sources. Waiāhole II, 105 Hawaiʻi at 17-19, 93 P.3d at 659-61. The court, however, further concluded that the Water Commission had erred by "basing its decision that . . . PMI had no practical alternative water sources (1) on the effect reduced water flows will have on the economic viability of the [Waiāhole] Ditch and (2) on the theory that public trust resources may not be prioritized." Id. at 20, 93 P.3d at 662. Because the Water Commission had failed to articulate "its analysis with reasonable clarity," the court could not tell if the Water Commission had relied upon these two factors in reaching its decision that PMI had no practicable alternative water sources. Id. at 21, 93 P.3d at 663. Thus, the court stated it had "no choice" but to vacate PMI's water use permit. Id. The court remanded the case for further findings and conclusion regarding "the practicability of . . . PMI using alternative ground water sources." Id. at 27, 93 P.3d at 669.

On remand, the Windward Parties filed a motion to deny PMI's permit application. In their motion, the Windward Parties stated that "PMI does not have the need for water assumed in its application, and it appears that its golf course is not even in

operation, despite many years of these proceedings." The Windward Parties attached a May 31, 2004, Honolulu Advertiser newspaper article which: 1) described the Pu'u Makakilo Golf Course as "defunct"; 2) reported that the golf course clubhouse had not been manned by security for several years and had been vandalized within the past two months; 3) stated that Grace Pacific Corp.[10] had purchased the golf course and clubhouse at a foreclosure auction in 1994 and was planning to turn the clubhouse into a corporate office; and 4) reported that a vice-president of Grace Pacific Corp. said that the area is not suitable for a golf course. The Windward Parties proffered more recent evidence that the clubhouse appeared to have been demolished. They also cited monthly water use statistics which showed that PMI had not used any Waiāhole Ditch water in the prior six months; that since the Water Commission issued D&O II, PMI's average monthly water use ranged from 0.0 to 0.057 mgd; and that in the prior 39 months, PMI's water use was negligible, exceeding 0.05 mgd in only three of those months. The Windward Parties also cited evidence indicating it was likely that PMI had been using less than half of the acreage for which PMI had been allocated water.

In their motion, the Windward Parties argued that PMI bears the burden of justifying its proposed water use, including the burden of establishing that such use is reasonable and beneficial. They noted that "[d]emonstrating the absence of practicable mitigating measures . . . comprises only part of the reasonable-beneficial analysis." The Windward Parties asserted that because PMI had failed to establish an actual need for the 0.75 mgd sought by PMI's permit application, the Water Commission should deny PMI's permit application.

The Water Commission refused to consider the merits of the Windward Parties' motion. The Water Commission's refusal was

---

[10] In their opening brief, the Windward Parties refer to Grace Pacific Corp. as "PMI's parent." In a subsequent pleading filed with this court, Grace Pacific Corp. reported that PMI was merged into Grace Pacific Corp.

apparently based on its view that the supreme court's remand in
Waiāhole II precluded the Water Commission from considering the
Windward Parties' motion because the motion raised issues that
were not among the issues specified by the Waiāhole II court in
remanding the case.  Accordingly, with respect to PMI, the Water
Commission limited its consideration on remand to the
practicability of PMI using alternative ground water sources for
the 0.75 mgd it requested, the issue specifically identified by
the supreme court in remanding the case.  The Water Commission
reiterated findings from D&O II regarding its analysis of the
three ground water alternatives considered by PMI which showed
that they did not provide practicable alternatives to Waiāhole
Ditch water.  The Water Commission also confirmed that its
analysis of these ground water alternatives formed the basis for
its determination that PMI had met PMI's burden of establishing
the absence of any practicable alternative water source and for
the Water Commission's decision to grant PMI's permit
application.  The Water Commission therefore reinstated PMI's
water use permit for 0.75 mgd.

B.    The Water Commission erred in refusing on remand
      to consider the Windward Parties' motion on the
      merits before deciding to grant PMI's water use
      permit application.

In its answering brief, PMI argues that the issue
raised by the Windward Parties' motion exceeded the scope of the
issues on remand and thus the Water Commission properly refused
to consider the merits of the motion.  We disagree.

On remand, it is the duty of a tribunal "to comply
strictly with the mandate of the appellate court according to its
true intent and meaning, as determined by the directions given by
the reviewing court."  State v. Lincoln, 72 Haw. 480, 485, 825
P.2d 64, 68 (1992).  However, on remand, the tribunal is free to
decide issues not covered in the mandate and issues that were not
decided explicitly or by necessary implication in the prior
appeal.  Id.; Liberty Mut. Ins. Co. v. E.E.O.C., 691 F.2d 438,

441 (9th Cir. 1982). In addition, even where an issue has been addressed by the appellate court and is covered by the mandate, the tribunal on remand may reconsider the issue based on new evidence or changed circumstances. Lincoln, 72 Haw. at 485, 825 P.2d at 68 ("This is not to say that a trial court is bound to perform the mandate of an appellate court under subsequently changed circumstances . . . ."); United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (stating that exceptions to the "law of the case" doctrine, which generally preclude reconsideration of an issue that has already been decided by the same or higher court, include "where: . . . 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result").

In Waiāhole II, the Hawai'i Supreme Court addressed the issue of whether the Water Commission had properly determined that PMI did not have a practicable alternative water source for its 0.75 mgd permit application. However, the absence of a practicable alternative water source is only one component of the State Water Code's reasonable-beneficial use standard, which "allows use only 'in such a quantity as is necessary for economic and efficient utilization.'" Waiāhole I, 94 Hawai'i at 161, 9 P.3d at 473 (quoting the definition of "reasonable-beneficial use" set forth in HRS § 174C-3). The Windward Parties' motion did not raise the issue of whether PMI had a practicable alternative water source for its 0.75 mgd permit application, but focused on the question of whether the 0.75 mgd requested by PMI was necessary for PMI to economically and efficiently utilize its property. Thus, it is not clear that by vacating PMI's permit and remanding the case for further proceedings on the practicability of PMI using alternative ground water sources in Waiāhole II, the supreme court decided the issue raised in the Windward Parties' motion.

More significantly, even if the supreme court had decided the issue raised in the Windward Parties' motion in Waiāhole II, the Windward Parties' motion proffered new evidence

26

of significantly changed circumstances that occurred after the Water Commission issued its decision in D&O II. The new evidence of significantly changed circumstances set forth in the Windward Parties' motion had not been before the supreme court when it decided Waiāhole II. Accordingly, the Water Commission was not precluded from considering the Windward Parties' motion based on the supreme court's mandate in Waiāhole II. See Lincoln, 72 Haw. at 485, 825 P.2d at 68; Alexander, 106 F.3d at 876.

The Windward Parties proffered evidence that after the Water Commission issued D&O II, the circumstances regarding PMI's plans to operate of a golf course, which formed the basis for PMI's water use permit application, had changed. The evidence proffered by the Windward Parties indicated that PMI no longer needed the requested 0.75 mgd to irrigate a golf course because PMI had indefinitely delayed or abandoned its plans to operate a golf course and because PMI had not used the vast majority of the 0.75 mgd allocated to it in the prior 39 months.

We conclude that under the particular facts of this case, the Water Commission erred in refusing to consider the Windward Parties' motion on the merits before deciding to grant PMI's water use permit application. The evidence proffered by the Windward Parties went to the very heart of the State Water Code's reasonable-beneficial use standard and challenged the essence of PMI's permit application -- whether PMI in fact had any legitimate need for the requested water to economically and efficiently utilize its property.

Under analogous circumstances, the Hawai'i Supreme Court held that the Water Commission had erred in failing to consider the impact that the closure of a hotel and golf course would have in rendering its decision on a permit application. In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Moloka'i), Inc., 116 Hawai'i 481, 504-06, 174 P.3d 320, 343-45 (2007) (Kukui Moloka'i). In Kukui Moloka'i, the Water Commission issued a permit which included allocations of water to a hotel and golf course as proposed uses. Id. at 505, 174 P.3d

27

at 344.  The Water Commission's findings and conclusions did not indicate that it had taken the closing of the hotel and golf course into consideration in its proposed use allocation decision.  Id.  The supreme court vacated the Water Commission's decision to grant the applicant a permit for proposed uses "[b]ecause the [Water] Commission failed to consider whether and to what extent the closure of the hotel and golf course would have on [the applicant's] proposed uses when [the Water Commission] made its proposed use allocation decision . . . ." Id. at 506, 174 P.3d at 345.[11/]

Our conclusion that the Water Commission erred in refusing to consider the Windward Parties' motion on the merits is additionally supported by the affirmative duty of the State of Hawai'i (State) "to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible."  Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453 (internal quotation marks, citation, and footnote omitted).  The Hawai'i Supreme Court "has described the public trust relating to water resources as the authority and duty 'to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses.'"  Id. at 138, 9 P.3d at 450 (citation omitted).  Article XI, section 7 of the Hawai'i Constitution provides that "[t]he State has an obligation to protect, control and regulate the use of Hawai'i's water resources for the benefit of its people[,]" and the Hawai'i Constitution "designates the [Water] Commission as the primary guardian of public rights under the trust."  Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455.

---

[11/] In Kukui Moloka'i, the Water Commission justified its refusal to consider evidence of the closure of the hotel and golf course in issuing the permit based in part on HRS § 174C-58(4) (1993), which authorizes the Water Commission to revoke a permit as to the amount of water not used for a period of four continuous years or more.  Kukui Moloka'i, 116 Hawai'i at 504-05, 174 P.3d at 343-44.  The supreme court rejected the Water Commission's reliance on HRS § 174C-58(4) as "misplaced."  Id. at 506, 174 P.3d at 345.  We likewise reject as misplaced PMI's reliance on HRS § 174C-58(4) in support of its claim that the Water Commission did not err in refusing to consider the merits of the Windward Parties' motion.

28

The Hawai'i Supreme Court has stated that "the [Water] Commission must not relegate itself to the role of a mere umpire passively calling balls and strikes for adversaries appearing before it, but instead must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decisionmaking process." Waiāhole II, 105 Hawai'i at 16, 93 P.3d at 658 (block quote format, citation, and ellipsis points omitted). The evidence proffered in the Windward Parties' motion raised a substantial question over whether PMI actually needed the water for the requested purpose. In furtherance of its public trust obligations, the Water Commission should have considered the merits of the Windward Parties' motion, in order to evaluate whether PMI's proposed use of Waiāhole Ditch water was a reasonable-beneficial use, before issuing PMI a permit for 0.75 mgd.

### III. The IIFSs for the Windward Streams

In D&O II, the Water Commission cited testimonials from people who had lived in the area of the windward streams in the 1950s and 1960s. These individuals reported that up to the 1960s, there was adequate flows in the streams to support the streams' ecosystems and native Hawaiian customs, with some of the individuals reporting a significant decrease in the amount of water in the streams after 1962 and 1963.

In Waiāhole II, the Hawai'i Supreme Court concluded that the Water Commission did not err in deeming credible and relying on the testimony that the streams' flows in the 1960s were adequate to support the windward streams' ecosystems and native Hawaiian customs and practices. Id. at 12, 93 P.3d at 654. The supreme court, however, held that the Water Commission "failed to make findings of each [windward] stream's flow during the 1960s[,]" and, as a result, the Water Commission "failed to support its conclusion that the current IIFS flow is more than the flow in the 1960s." Id.

The supreme court then stated:

> If, on remand, the Water Commission is able to support its conclusion with findings quantifying the windward streams' flows during the 1960s, then the 1960s testimonials would be sufficient to set the IIFS at the levels established in the D&O II, inasmuch as: (1) more water would be added to the streams than that which adequately supported the streams' ecosystem in the 1960s; (2) the increase in stream flow over the 1960s stream flow would be beneficial in light of the Water Commission's finding that increasing a stream's flow results in stream habitat improvement; and (3) appurtenant rights, riparian uses, and existing uses would be accounted for by further increases in stream flow. The foregoing would then adequately establish that instream values would be protected to the extent practicable for interim purposes.

Id. (citations omitted).

On appeal, the Windward Parties attack the IIFSs established by the Water Commission in D&O III, arguing: (1) that contrary to the Waiāhole II court's instructions, "D&O III does not contain any data establishing the flows during the 1960s"; and (2) that the Water Commission erred in refusing to include unpermitted water in the amended IIFSs. We disagree.

A. The Water Commission set forth sufficient findings to support its conclusion that the current IIFS flow is more than the flow in the 1960s.

In D&O III, the Water Commission set forth specific findings regarding the estimated long-term stream flows, including the Q90 flows,[12] of the windward streams based on data from the United States Geological Survey (USGS), which used the base period July 1, 1926, to June 30, 1960. The Water Commission found that the Waiāhole Ditch flows have been stable since 1938. It also set forth findings that addressed three events occurring since the mid-1960s that might have impacted the windward

---

[12] The Q90 flow is a measure of the base flow which the Water Commission used to determine the IIFSs. In D&O III, the Water Commission described "base flow" and "Q90 flow" as follows:

> The base flow is an estimate of the ground-water contribution to the stream. The Q90 flow is used as an index of the reliability of flow from a water source for water development studies and represents that volume of water that is equaled or exceeded 90 percent of the time over the period of record. The Q90 flow is an estimate of the dry weather flow (base flow) of streams, and, in most cases, the Q90 flow is an estimate of the ground-water contribution to the stream.

streams' base flows -- the 1964 extension of the Uwau Tunnel, the 1982 cessation of pumping of 1 to 1.5 mgd of water from Waiāhole Stream, and the 1992 installation of the Kahana Tunnel bulkhead -- and explained its conclusion that none of these events had a significant impact on the 1960s base flows of the windward streams.[13]

We conclude that the Water Commission set forth sufficient findings to quantify the windward streams' flows during the 1960s and to support its conclusion that the current IIFS flow is more than the flow in the 1960s, and it therefore complied with the instructions of the Waiāhole II court.  In Waiāhole II, the court concluded that the Water Commission was entitled to rely upon the testimony of people who had personally observed the windward streams in the 1950s and 1960s.  Because these individuals reported adequate flows at least up to the early 1960s, we cannot say that the Water Commission erred in relying on USGS data which used the base period July 1, 1926, to June 30, 1960 to estimate the windward streams' flows during the 1960s.  In addition, the Water Commission found that the Waiāhole Ditch flows have been stable since 1938, and it set forth findings concerning events that occurred since the mid-1960s that might have impacted the windward streams' base flows and explained why those events had no significant impact on the streams' base flows.  The Water Commission's findings and analysis support its conclusion that the amount of Waiāhole Ditch water it was adding to the windward streams through its amended IIFSs in D&O III increased the streams' flows over the flows existing in the 1960s.  We therefore conclude that the Water Commission did not err in establishing the amended IIFSs for the windward streams.

---

[13] The Water Commission concluded that the Uwau Tunnel extension could have decreased stream flows and the other two events could have increased stream flows.

B.   The Water Commission did not err in declining to
     include unpermitted water in the amended IIFSs.

In D&O III, of the 27 mgd of water developed by the
Waiāhole Ditch, the Water Commission allocated 12 mgd for
addition to the windward streams under the amended IIFSs.  The
Water Commission issued permits allocating 12.57 mgd for
offstream use to various permittees, leaving 2.43 mgd of Waiāhole
Ditch water that remained unpermitted.  The Water Commission
ruled that the 2.43 mgd of unpermitted water would "be diverted
into the windward streams until such time as it is permitted for
offstream use."

The Windward Parties argue that the Water Commission
erred in failing to include the 2.43 mgd in unpermitted water in
the amended IIFSs.  We conclude that this argument lacks merit.

In Waiāhole I, the supreme court disapproved of the
Water Commission's creation of a buffer of 5.39 mgd of
unpermitted water for unidentified offstream uses before IIFSs
were properly designated.  Waiāhole I, 94 Hawai'i at 155-56, 9
P.3d at 467-68.  The court explained that "where the [Water]
Commission has yet to designate proper instream flow
standards, [14/] a buffer stands the [Hawai'i] [C]onstitution and
[State Water] Code on their heads, allowing diversions of
instream flows before the completion of the requisite procedure
and analysis for instream use protection."  Id. at 156, 9 P.3d at
468 (footnote and emphases added).  In D&O III, however, the
Water Commission allocated Waiāhole Ditch water to first satisfy
the amended IIFSs before granting permits for offstream uses.
The unpermitted water remaining after the permits were granted
did not serve as the type of buffer that was struck down in
Waiāhole I.  While the unpermitted water remained available for
unspecified offstream uses, it was left unallocated only after

---

14/ In the context of this discussion, the supreme court used the term
"instream flow standards" to broadly encompass both "interim" and "permanent"
standards, unless otherwise indicated.  Waiāhole I, 94 Hawai'i at 147 n.48, 9
P.3d at 459 n.48.  We will do the same for purposes of our discussion in this
section.

32

the amended IIFSs were properly established to provide protection for the windward streams.

In Waiāhole I, the court contemplated that unpermitted water in excess of the instream flow standard could remain unallocated and would not automatically be incorporated in the instream flow standard. The court stated:

> Any flows in excess of [the instream flow standard] shall remain in the stream until permitted and actually needed for offstream use, in keeping with the policy against waste and in recognition that the standard merely states an absolute minimum required under any circumstances. These unallocated flows, however, will not constitute a distinct category or quantity, but will fluctuate according to variations in supply and demand.

Id. at 156, 9 P.3d at 468 (emphasis added). In addition, while vacating the Water Commissions's designation in D&O I of the IIFSs and the nonpermitted buffer, the court noted that it was not requiring the Water Commission to include the amount of the buffer in the IIFS. The court stated, "We do not bar the [Water] Commission, pending the establishment of permanent standards, from setting the interim standard lower than the combined total of the previous 'base' and the 'buffer' flows . . . ." Id. at 156, 9 P.3d at 468.

Here, we have held that the Water Commission did not err in establishing the amended IIFSs for the windward streams in D&O III. The amended IIFSs are at or exceed the D&O II levels which the supreme court held in Waiāhole II would be sufficient if the Water Commission could support its conclusion that the current (D&O II) IIFS flow is more than the flow in the 1960s. Waiāhole II, 105 Hawai'i at 12, 93 P.3d at 654. Under these circumstances, we conclude that the Water Commission did not abuse its discretion or act arbitrarily or capriciously in declining to include the 2.43 mgd in unpermitted water in the amended IIFSs.

## CONCLUSION

We vacate PMI's water use permit because we conclude that the Water Commission erred in refusing to consider the Windward Parties' motion on the merits before deciding PMI's

33

permit application, and we remand the case for further proceedings consistent with this Memorandum Opinion. On remand, the Water Commission shall consider whether changed circumstances since the issuance of D&O II have affected PMI's need for the requested 0.75 mgd of Waiāhole Ditch water under the State Water Code's reasonable-beneficial use standard. We express no opinion on the merits of this remanded issue. In all other respects, we affirm D&O III.

DATED: Honolulu, Hawai'i, October 13, 2010.

On the briefs:

Paul H. Achitoff
D. Kapua'ala Sproat
(Earthjustice)
for Petitioners/Appellants
Hakipu'u'ohana and
Ka Lāhui Hawai'i

Colin J. Lau
Deputy Attorney General
Department of the Attorney General
for Appellee
Commission on Water Resource
  Management

Yvonne Y. Izu
Michael H. Lau
(Morihara Lau & Fong LLP)
for Appellee
Monsanto Company
(previously for
James Campbell Company LLC)

Don Jeffrey Gelber
Stephen M. Gelber
Richard K. Ingersoll
(Gelber, Gelber & Ingersoll)
for Appellee
Syngenta Hawai'i, LLC

Chief Judge

Acting Associate Judge

Acting Associate Judge

On the briefs (continued):

Deborah Day Emerson
Haunani Burns
Myra M. Kaichi
Deputies Attorney General
Department of the Attorney General
for State of Hawai'i,
Agribusiness Development Corp.
and Department of Agriculture

James T. Paul
Pamela W. Bunn
(Paul Johnson Park & Niles)
for Hawaii's Thousand Friends

Gilbert D. Buston
(Reinwald O'Connor & Playdon LLP)
for Grace Pacific Corporation